UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL ‘O’**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-00874-CAS-AJRx | Date | November 2, 2026 |
| Title | James H. Lundberg v. CStown Cultural and Creative Dalian Co., Ltd. et al | | |

| | |
|---|---|
| Present: The Honorable | CHRISTINA A. SNYDER |

| Catherine Jeang | Laura Elias | N/A |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Theodore Chiacchio | Carole Reagan<br>Mei Tsang |

**Proceedings:** ZOOM HEARING RE:

PLAINTIFF JAMES H. LUNDBERG’S MOTION FOR ENTRY OF PRELIMINARY INJUNCTION (Dkt. 30, filed on October 2, 2026)

PLAINTIFF JAMES H. LUNDBERG’S NOTICE OF REQUEST TO CROSS-EXAMINE DEFENDANTS’ DECLARANT, HUIJIE “ROCKY” ZHAO, IN SUPPORT OF LUNDBERG’S MOTION FOR ENTRY OF PRELIMINARY INJUNCTION (DKT. 47, FILED ON OCTOBER 19, 2026)

## I. INTRODUCTION

On January 28, 2026, plaintiff James H. Lundberg, an individual d/b/a CS Athletic (“plaintiff” or “CS Athletic”) initiated the instant action against defendants CSTown Cultural and Creative (Dalian) Co., Ltd., CSTown USA Inc., and Tu Tu USA Inc. (collectively, “defendants” or “CSTown”). Dkt. 1 (“Compl.”). Plaintiff asserts four claims against all defendants: (1) federal unfair competition and false designation of origin pursuant to the Lanham Act, 15 U.S.C. § 1125(a); (2) unfair competition pursuant to Cal. Bus. & Prof. Code § 17200 *et seq.*; (3) unfair competition pursuant to the common law of the state of California; and (4) trademark infringement pursuant to the common law of the state of California. Id.

On October 2, 2026, plaintiff filed the instant motion for preliminary injunction. Dkt. 30 (“Mot.”). On October 9, 2026, defendants filed their opposition. Dkt. 37 (“Opp.”). On October 19, 2026, plaintiff filed his reply. Dkt. 43 (“Reply”).

That same day, on October 19, 2026, plaintiff filed a request to cross-examine defendants’ declarant, Huijie “Rocky” Zhao, at the hearing on the motion for preliminary injunction scheduled for November 2, 2026, pursuant to C.D. Cal. L.R. 7-8. Dkt. 47 (“Request”). On October 22, 2026, defendants filed their objections to plaintiff’s Request. Dkt. 49. On October 25, 2026, plaintiff filed a response to defendant’s objections. Dkt. 53. On October 27, 2026, defendant filed a response to plaintiff’s response. Dkt. 58. On October 29, 2026, plaintiff filed a response to that response. Dkt. 59.

On November 2, 2026, the Court held a hearing. Having carefully considered the parties’ arguments and submissions, the Court finds and concludes as follows.

## II. BACKGROUND

### A. The Parties and Their Marks

Plaintiff, doing business as CS Athletic, markets and sells cheerleading uniforms and athletic apparel, including shirts, shorts, footwear, and hair bows, as well as athletic bags (collectively, “Athletic Goods”). Mot. at 1-2 (citing Lunderg Decl. ¶¶ 7-9). Plaintiff has “marketed, offered for sale, sold, and shipped” these Athletic Goods under the CS ATHLETIC mark throughout the United States since March 2010. Id. at 2 (citing Lunderg Decl. ¶¶ 7-9).

Defendants market and sell customized apparel, accessories, and heat-transfer products under the CSTOWN mark to all potential buyers, including cheerleading, dance, and gymnastics teams and gyms. Opp. at 7-9. Defendants began using the CSTOWN mark in 2006 “in connection with both stock and custom-made iron-on transfers, decals, stickers, and patches.” Id. at 7. Defendants obtained federal registration of the CSTOWN mark in International Class 16 in 2012, id. at 7 (citing Zhao Decl., ¶¶ 16-17), which is for “Decals; Stickers and transfers; iron-on transfers,” Reply at 8 (citing Chiacchio Decl., Ex. 3). In 2019, defendants began offering “the custom-made apparel itself,” providing customers with “a more full-service option for apparel and accessories

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL ‘O’**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-00874-CAS-AJRx | Date | November 2, 2026 |
| Title | James H. Lundberg v. CStown Cultural and Creative Dalian Co., Ltd. et al | | |

decorated with the heat transfers made to their specifications and/or design.” Id. at 8 (citing Zhao Decl., ¶ 29).

In June 23, 2025, plaintiff applied for federal registration of the CS ATHLETIC mark for athletic apparel, bags, and other related goods in Classes 18 and 25 (“plaintiff’s Application”). Id. at 9; Compl. ¶ 25. In October 5, 2025, plaintiff sent defendants a cease-and-desist letter. Opp. at 9 (citing Lundberg Decl., Ex. 41). On October 30, 2025, defendants applied for federal registration of the CSTOWN mark for dance apparel, bags, and other related goods in Classes 18 and 25. Opp. at 9; Compl. ¶ 37. In April 2026, defendants filed an opposition to plaintiff’s Application, which remains pending before the Trademark Trial and Appeal Board. Opp. at 9.

Both parties have and continue to market and sell custom-made cheerleading apparel through online channels, including their respective websites and social media accounts. Mot. at 2-3, 6; Opp. at 7-9.

### B. Alleged Consumer Confusion and Resulting Harm

Plaintiff contends that the CS ATHLETIC and CSTOWN marks are substantially similar and identifies several instances of alleged consumer confusion between May 2023 and June 2026. Mot. at 11-16. These include a cheer gym owner who allegedly purchased products from CSTown while believing she was purchasing from CS Athletic; customers who contacted CS Athletic while referring to CSTown or attaching images of CSTown products; and a publication by “Cheer Media” that mistakenly identified CSTown instead of CS Athletic in its annual Cheer Awards rankings. Id. at 13-16.

Defendants dispute that those incidents establish confusion amongst consumers about the source of the parties’ goods. Opp. at 23-24. Defendants further assert that they have “encountered no instances of consumer confusion.” Opp. at 9.

Plaintiff asserts that CS Athletic’s U.S. sales decreased “by 8% . . . from 2023 to 2024, 5% from 2024 to 2025, and by approximately 35% for peak season thus far from 2025 to 2026.” Mot. at 17-18 (citing Lundberg Decl. ¶¶ 39, 41-42). Plaintiff attributes this decline to consumer confusion resulting from defendants’ use of the CSTOWN mark and contends that plaintiff has suffered “loss of business, loss of brand control, loss of brand identity and recognition, and damage to CS Athletic’s marketplace goodwill.”

Mot. at 1-2. Plaintiff further asserts that defendants increased their paid search engine advertising in 2025 and that the impact of this marketing activity was not apparent until peak season in 2026. Reply at 16-17.

Defendants dispute any causal connection between their marketing activities and CS Athletic's declining revenue. See generally Opp. Defendants contend that plaintiff has not shown that customers purchased from defendants rather than CS Athletic because of trademark confusion, as opposed to other competitive factors such as "better prices, service, selection, or marketing." Opp. at 14.

### C. Requested Relief

Plaintiff requests the "entry of a [p]reliminary [i]njunction prohibiting [d]efendants and those in active concert or participation with [d]efendants from using the CS ATHLETIC mark and any colorable imitation thereof, including but not limited to the Infringing Marks, in connection with the promotion, offering to sell, and selling of [Athletic Goods], during the pendency of this action." Mot. at 19-20.

Defendants maintain the requested injunction would require them to "abandon the commercial identity under which they have operated for 20 years." Opp. at 6, 8.

## III. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 24 (2008). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." Winter, 555 U.S. at 20; accord Am. Trucking Ass'n, Inc. v. City of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009). Alternatively, "'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can support issuance of an injunction, assuming the other two elements of the Winter test are also met." All. for the Wild Rockies v. Cottrell, 632 F.3d 1127, 1132 (9th Cir. 2011) (interpreting Winter and explaining that the "sliding scale" test for preliminary injunctive relief remains valid). A "serious question" is one on which the movant "has a fair chance of success on the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL 'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-00874-CAS-AJRx | Date | November 2, 2026 |
| Title | James H. Lundberg v. CStown Cultural and Creative Dalian Co., Ltd. et al | | |

merits." Sierra On-Line, Inc. v. Phoenix Software, Inc., 739 F.2d 1415, 1421 (9th Cir. 1984).

A plaintiff seeking a preliminary injunction must show more than the "possibility" of irreparable injury; he must demonstrate that irreparable injury is "likely" in the absence of preliminary relief. Winter, 555 U.S. at 22; Am. Trucking, 559 F.3d at 1052. It is not enough that the claimed harm is irreparable—it also must be imminent. Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988). Conclusory affidavits are insufficient to demonstrate irreparable harm. Am. Passage Media Corp. v. Cass Commc'ns, Inc., 750 F.2d 1470, 1473 (9th Cir. 1985).

## IV. DISCUSSION

### A. Evidentiary Objections and Request for Cross-Examination

As an initial matter, the parties have filed several evidentiary objections. See dkt. 38 (defendants' objections to Lundberg Decl.); dkt. 48 (plaintiff's objections to Zhao Decl.); dkt. 51 (defendants' objections to Lundberg Suppl. Decl.).

However, "[d]ue to the urgency of obtaining a preliminary injunction at a point when there has been limited factual development, the rules of evidence do not apply strictly to preliminary injunction proceedings." Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc., 736 F.3d 1239, 1250 n.5 (9th Cir. 2013) (citation omitted). For example, a district court may "consider hearsay in deciding whether to issue a preliminary injunction." Johnson v. Couturier, 572 F.3d 1067, 1083 (9th Cir. 2009) (citations omitted). "While district courts may consider inadmissible evidence in the context of a preliminary injunction, this does not mean that evidentiary issues have no relevance to this proceeding. Such issues, however, properly go to weight rather than admissibility." Disney Enters. v. VidAngel, Inc., 224 F. Supp. 3d 957, 966 (C.D. Cal. 2016) (citation omitted); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2949 (3d ed. 1998).

In light of the relaxed evidentiary standard for preliminary injunction proceedings, the Court need not rule on admissibility; the Court has considered the likely admissibility of the evidence when assessing whether to order the preliminary injunction. See Disney Enterprises, 224 F. Supp. 3d at 966 n.1.

* * *

Plaintiff has separately filed a request to cross-examine defendants' declarant, Huijie "Rocky" Zhao, at the hearing on the motion for preliminary injunction scheduled for November 2, 2026, pursuant to C.D. Cal. L.R. 7-8. <u>See generally</u> Request.

Local Rule 7-8 provides that, on a motion for a preliminary injunction, a party "desiring to cross-examine any declarant who is not beyond the subpoena power of the Court and who is reasonably available to the party offering the declaration may . . . file a notice of request to cross-examine such declarant." C.D. Cal. L.R. 7-8.

However, "courts rarely allow oral testimony on motions." <u>Eng'r.AI Corp. v. Kaufman</u>, No. 2:22-cv-03552-SPG-KS, 2022 LX 137318, at *19 (C.D. Cal. Sep. 9, 2022) (quoting <u>SEC v. Gold Standard Mining Corp.</u>, No. CV 12-05662 JGB (CWx), 2013 WL 12142371, at *5 (C.D. Cal. May 15, 2013)). Moreover, courts often deny the request where the movant does not offer any reasons for cross-examining the declarant. <u>See, e.g.</u>, <u>A.M. v. City of Fontana</u>, No. 5:25-cv-02092-SSS-SPx, 2026 LX 454703, at *2 (C.D. Cal. Aug. 4, 2026) (denying Rule 7-8 request where movant offered "no reasons for cross-examining the declarants"); <u>Eng'r.AI Corp.</u>, 2022 LX 137318, at *19 (denying Rule 7-8 request where the movant "provided zero basis to cross-examine" declarant).

Here, plaintiff has not shown that this is that rare case that justifies oral testimony. Indeed, plaintiff does not provide *any* basis for why cross-examination of Zhao is necessary in his Request, dkt. 47, and only in his reply to defendants' objections to his Request does he assert that "it is self-evident why [plaintiff] would seek to cross-examine Mr. Zhao," given that Zhao has submitted a "14-page declaration containing a total of 59 paragraphs of purported factual assertions," dkt. 53.

The Court therefore denies plaintiff's Request.

### B. Likelihood of Success on the Merits

For each of plaintiff's claims, plaintiff must show that: (1) he has a valid, protectable trademark; and (2) that defendants' use of the mark is likely to cause consumer confusion. <u>See</u> <u>Century 21 Real Estate Corp. v. Magee</u>, No. CV 90-6001-WMB, 1991 U.S. Dist. LEXIS 14611, at *7-8 (C.D. Cal. Feb. 27, 1991) (observing that the elements of federal false designation, and federal and state trademark infringement

and unfair competition claims, are the same). The Court first addresses the likelihood of consumer confusion.

The Ninth Circuit has identified eight relevant factors to determine whether consumers would likely be confused by related goods: (1) strength of the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the purchaser; (7) the defendant's intent in selecting the mark; and (8) likelihood of expansion of the product lines. AMF Inc. v. Sleekcraft Boats, 599 F.2d 341, 348-49 (9th Cir. 1979). This list of factors is not exhaustive; "[o]ther variables may come into play depending on the particular facts presented." Id. at 348 n.11. Further, "[t]he Sleekcraft factors are intended as an adaptable proxy for consumer confusion, not a rote checklist." Network Automation, Inc. v. Advanced Sys. Concepts, 638 F.3d 1137, 1145 (9th Cir. 2011).

1. Strength of the Mark

"The stronger a mark—meaning the more likely it is to be remembered and associated in the public mind with the mark's owner—the greater the protection it is accorded by the trademark laws." Brookfield Communs., Inc. v. W. Coast Entm't Corp., 174 F.3d 1036, 1058 (9th Cir. 1999). Two relevant measurements are commercial strength and conceptual strength. See Network, 638 F.3d 1137.

Commercial strength is based on "actual marketplace recognition," and thus "advertising expenditures can transform a suggestive mark into a strong mark." Brookfield, 174 F.3d at 1058. However, because commercial strength is an evidence-intensive inquiry, the Ninth Circuit has held that it is not necessary to consider this measure at the preliminary injunction stage. See Network Automation, 638 F.3d at 1150 ("The district court properly declined to consider commercial strength, which, as an evidence-intensive inquiry, is unnecessary at the preliminary injunction stage."). Therefore, the Court does not consider the mark's commercial strength at this stage.

Conceptual strength involves classification of a mark as either: "(1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, or (5) fanciful." Zobmondo Ent., LLC v. Falls Media, LLC, 602 F.3d 1108, 1113 (9th Cir. 2010). "Suggestive, arbitrary, and fanciful marks are considered 'inherently distinctive' and are automatically entitled to federal

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL ‘O’**

| Case No. | 2:26-cv-00874-CAS-AJRx | Date | November 2, 2026 |
|---|---|---|---|
| Title | James H. Lundberg v. CStown Cultural and Creative Dalian Co., Ltd. et al | | |

trademark protection because ‘their intrinsic nature serves to identify a particular source of a product.’” Id. “Merely descriptive marks are . . . not inherently distinctive and are therefore not entitled to automatic trademark protection,” but “can become protectable if it has acquired distinctiveness ‘as used on or in connection with the applicant’s goods in commerce.’” Id.

Here, plaintiff contends that CS ATHLETIC is a fanciful mark because the letters “CS” have no “apparent” relationship to cheerleading uniforms or athletic apparel. Mot. at 9-10. Defendants maintain that the mark is arbitrary. Opp. at 19-20. Whether the mark is fanciful or arbitrary, this factor weighs in plaintiff’s favor because, in either case, the mark is inherently distinctive.

2. Proximity of the Goods

Plaintiff asserts that the parties offer identical goods under their respective marks: cheerleading uniforms and practice wear, including but not limited to shirts, shorts, footwear, hairbows, and athletic bags. Mot. at 10-11. Because defendants concede that the goods that each party sells are closely related, Opp. at 21, the Court finds that this factor weighs in plaintiff’s favor.

3. Similarity of the Marks

The similarity of marks “has always been considered a critical question in the likelihood-of-confusion analysis.” GoTo.com, 202 F.3d at 1205. “Similarity of the marks is tested on three levels: sight, sound, and meaning.” Sleekcraft, 599 F.2d at 351. Although “a court may consider and give more weight to the dominant features of a mark, in determining whether two marks are similar, the court must compare both marks *in their entirety*.” Moose Creek, Inc. v. Abercrombie and Fitch Co., 331 F.Supp. 2d 1214, 1227 (C.D. Cal. 2004) (emphasis in original); see also M2 Software, Inc. v. Madacy Entm’t, 421 F.3d 1073, 1082 (9th Cir. 2005) (“Moreover, the trademark is not judged by an examination of its parts, but rather the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace.”) (cleaned up). Furthermore, “[a]lthough similarity is measured by the marks as entities, similarities weigh more heavily than differences.” Sleekcraft, 599 F.2d at 351.

Plaintiff argues that "CS" is the dominant element of the CS Athletic mark and emphasizes that defendants' mark incorporates the entirety of the dominant element of plaintiff's mark. Mot. at 11-13.

Defendants counter that consumers encounter the marks, CS ATHLETIC and CSTOWN, as "complete designations" and emphasize the following differences: (1) CS ATHLETIC contains two separate words, whereas CSTOWN is a single word; and (2) CS ATHLETIC often appears as a logo with "CS" only, whereas "CSTOWN" always appears as "CSTOWN." Opp. 20-21. Defendants also underscore the stylistic differences between the parties' respective logos, including the different typefaces and coloring, and present the following images:

Id.

Here, the marks are visually dissimilar. CS ATHLETIC is composed of two words; CSTOWN is one word. Furthermore, when viewed in conjunction with the parties' logos, the differences are striking. See Lamps Plus, Inc. v. Lamps Pro, LLC, No. 2:24-cv-07435-CBM-(PDx), 2024 U.S. Dist. LEXIS 192790, at *8 (C.D. Cal. Oct. 23, 2024) (considering logos in conjunction with the text of the marks in weighing this factor). CS Athletic's logo consists of a heart symbol containing the letters "CS," with the "CS Athletic" text below, whereas CSTown's logo appears as one word with the "T" contrasted through coloring and elongation of the horizontal top stroke of the letter. See id. (concluding that the marks are dissimilar in sight because they are written with "different font and Defendants' logo has a particular design as well as the tagline 'THE BRIGHT CHOICE'"); cf. GoTo.com, Inc. v. Walt Disney Co., 202 F.3d 1199 (9th Cir. 2000) (finding similarity in sight because "[b]oth logos consist of white capital letters in an almost identical sans serif font rendered on a green circle" and "[t]he circle in turn is matted by a square yellow background").

And although the frequent absence of either party's logo in the marketplace may impact the Court's analysis on visual similarity, there is no showing that this is the case here. See Sleekcraft, 599 F.2d at 351 (giving weight to the fact that "the logo is often absent" even though "the names [Slickcraft and Sleekcraft] appear dissimilar when viewed in conjunction with the logo"). Indeed, although plaintiff in his Reply states that his mark "frequently appears without the shield logo," the cited exhibit for that claim (which consist of multiple screenshots of plaintiff's website) does not establish how frequently consumers encounter the mark without its accompanying design, given that the logo appears prominently and numerous times in that exhibit. Reply at 12-13 (citing Chiacchio Suppl. Decl. 5, Ex. B). Furthermore, defendants have demonstrated that their mark is often presented in logo form, which lessens the likelihood that consumers will confuse the two marks. Opp. at 21; Rocky Decl., Ex. 20.

Moreover, here, the marks "sound different." Kellogg Co. v. Pack'Em Enters., 951 F.2d 330, 333 (Fed. Cir. 1991). Defendants maintain that CSTOWN is derived from "creative stone" and pronounced "c-stone." Opp. at 20-21 (citing Zhao Decl., ¶¶ 53-57). Even assuming the initial letters "CS" is pronounced alike, CS ATHLETIC and CSTOWN have different complete pronunciations. See id. (holding that "FROOTEE ICE" does not infringe on "FROOT LOOPS" mark because the marks "sound different and create different commercial impressions," despite both marks sharing the same first five letters); Nutri/System, Inc. v. Con-Stan Indus., 809 F.2d 601, 605 (9th Cir. 1987) (upholding a finding of dissimilarity based on appearance, sound, and meaning despite the marks sharing the identical initial prefix "Nutri").

The marks also convey different "commercial impressions." Kellogg, 951 F.2d at 333. Textually, CS ATHLETIC expressly includes the word "athletic" whereas CSTOWN does not. Logo-wise, the two marks—plaintiff's heart-shaped logo containing the letters "CS" in light blue color and defendants' black-and-red, bold-faced logo featuring a sharp-edged top stroke of the letter "T"—when viewed "sequentially in the context of the marketplace," are not likely to confuse consumers into thinking the designs are associated with the same source. See Bos. Duck Tours, LP v. Super Duck Tours, LLC, 531 F.3d 1, 29 (1st Cir. 2008) ("Although each [mark] contains the central image of a cartoon duck in water, the ducks are significantly different in overall appearance. Further, the other elements depicted in conjunction with the duck are substantially

dissimilar. Together, these differences indicate that the designs are associated with separate, unrelated sources rather than the same one.").

Having considered both the shared two letters of "CS" and the marks' respective appearances, sounds, and commercial impressions, the Court concludes that plaintiff has not established that the marks are sufficiently similar for this factor to favor a likelihood of confusion.[1]

4. Evidence of Actual Confusion

"A showing of actual confusion among significant numbers of consumers provides strong support for the likelihood of confusion." Network Automation, 638 F.3d at 1151 (brackets and citations omitted).

Here, plaintiff submits eight instances of consumer confusion amongst over a three-year period, from May 2023 until June 2026. Mot. at 13-15. However, the sole example from 2025 does not involve a customer at all, but rather a media company covering the cheerleading industry that mistakenly used CSTown's name in a publication rather than CS Athletic's. Id. Even assuming that the other seven instances demonstrate actual consumer confusion, seven instances across three years is insufficient to establish

[1] Moreover, the authorities plaintiff relies upon do not require a contrary conclusion. In Gallo, both marks shared the complete dominant word, "GALLO." E. & J. Gallo Winery v. Gallo Cattle Co., 967 F.2d 1280, 1291 (9th Cir. 1992). Similarly, in Sandlin, the marks shared the complete leading term "CENTURY." Century 21 Real Estate Corp. v. Sandlin, 846 F.2d 1175, 1179 (9th Cir. 1988). And in the various Entrepreneur Media cases cited by plaintiff, the challenged marks incorporated the complete, recognizable term, "ENTREPRENEUR." See Entrepreneur Media, Inc. v. Nkwocha, SACV 18-01336 AG (ADSx), 2019 U.S. Dist. LEXIS 77221, at *5 (C.D. Cal. May 6, 2019); Entrepreneur Media, Inc. v. Alfonso, No. 8:21-cv-00644-DOC-(JDEx), 2021 LX 45468, at *15 (C.D. Cal. July 12, 2021); Entrepreneur Media, Inc. v. Smith, No. CV 98-3607 FMC (CTx), 2004 U.S. Dist. LEXIS 24078, at *6 (C.D. Cal. June 23, 2004). Here, by contrast, the common element consists of only two letters, and the marks differ substantially when viewed in their entirety, as discussed *supra*.

that this factor weighs in favor of confusion. See Vital Pharms., Inc. v. PHD Mktg., No. 2:20-cv-06745-RSWL-JCx, 2020 U.S. Dist. LEXIS 208394, at *15 (C.D. Cal. Nov. 6, 2020) (“[T]he Court cannot determine at this [preliminary injunction] stage that twelve such instances [of actual confusion] necessarily establish that the alleged infringement is ‘likely to confuse an appreciable number of people as to the source of the product.’”) (citing Entrepreneur Media v. Smith, 279 F.3d 1135, 1151 (9th Cir. 2002)); Equinox Hotel Mgmt. v. Equinox Holdings, Inc., No. 17-cv-06393-YGR, 2018 LX 76314, at *18, *23 (N.D. Cal. Feb. 1, 2018) (finding that “eleven incidents” over the course of 30 months were “insufficient to support a finding of actual confusion”).

Accordingly, the Court finds that plaintiff has not shown this factor weighs in favor of a likelihood of consumer confusion.

5. Marketing Channels Used

“Convergent marketing channels increase the likelihood of confusion.” Sleekcraft, 599 F.2d at 353.

Here, the parties do not dispute that the parties share the same marketing channels—i.e., their websites and social media accounts. See generally Mot.; Opp. This factor, however, is “less important” where, as here, the marketing channel is “less obscure” than the “niche marketplaces, including boat shows, specialty retail outlets, and trade magazines” involved in the seminal case, Sleekcraft. Network Automation, Inc. v. Advanced Sys. Concepts, 638 F.3d 1137, 1151 (9th Cir. 2011). Indeed, as the Ninth Circuit articulated in Network Automation, “[t]oday, it would be the rare commercial retailer that did not advertise online, and the shared use of a ubiquitous marketing channel does not shed much light on the likelihood of consumer confusion.” Id.

Accordingly, the Court finds that this factor weighs neutrally. See Playboy Enters. v. Netscape Communs. Corp., 354 F.3d 1020, 1028 (9th Cir. 2004) (“Given the broad use of the Internet today, the same could be said for countless companies. Thus, this factor merits little weight.”); Network Automation, 638 F.3d at 1151 (holding that “the district court’s determination that because both parties advertise on the Internet this factor weighed in favor of [the movant of the preliminary injunction] was incorrect”).

6. Type of Goods and the Degree of Care Likely to be Exercised by the Purchaser

"Low consumer care . . . increases the likelihood of confusion." Playboy, 354 F.3d at 1028. "In assessing the likelihood of confusion to the public, the standard used by the courts is the typical buyer exercising ordinary caution . . . . When the buyer has expertise in the field, a higher standard is proper though it will not preclude a finding that confusion is likely. Similarly, when the goods are expensive, the buyer can be expected to exercise greater care in his purchases; again, though, confusion may still be likely." Sleekcraft, 599 F.2d at 353 (citations omitted).

Plaintiff argues that purchasers of the parties' Athletic Goods are not professional commercial clothing buyers, but rather "cheer gyms." Mot. at 16. Defendants counter that the Athletic Goods the parties sell are "not products that consumers just click and purchase[] as they do on Amazon or other retail sites" because they involve "customization." Opp. at 22. Defendants further argue that such "customization require a higher degree of customer attention, which means consumers are less likely to be confused as to source and to understand which company they are dealing with." Id. Defendants also assert that purchasers "typically engage in multiple communications, review samples, convey designs and specifications before ordering." Id. (citing Zhao Decl., ¶¶ 38-46; Lundberg Decl. ¶ 16).

The Court finds that the degree of care likely to be exercised by purchasers is not low given that much of the appeal of the parties' Athletic Goods is customization for team sports, including cheerleading. See Electropix Inc. v. Liberty Livewire Corp., 178 F. Supp. 2d 1125, 1134 (C.D. Cal. 2001) (stating that a reasonable consumer is likely to exercise a high degree of care when purchasing unique, non-fungible services offered on a project-by-project basis); see also Nike, Inc. v. "Just Did It" Enters., 6 F.3d 1225, 1230 (7th Cir. 1993) (rejecting the notion that the degree of care in purchasing t-shirts "depends solely upon price").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL** **'O'**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-00874-CAS-AJRx | Date | November 2, 2026 |
| Title | James H. Lundberg v. CStown Cultural and Creative Dalian Co., Ltd. et al | | |

Accordingly, the Court finds that this factor weighs slightly against likelihood of consumer confusion.[2]

* * *

Because the parties address only the first six Sleekcraft factors in their briefs, the Court assigns no weight to the remaining two Sleekcraft factors on the present record. On balance, the Court finds that plaintiff has failed to carry his burden of demonstrating that the Sleekcraft factors weigh in favor of a likelihood of consumer confusion, a necessary showing across all of plaintiff's claims. Accordingly, the Court need not address the parties' competing arguments concerning priority of use at this preliminary stage to conclude that plaintiff has failed to establish a likelihood of success on the merits of his claims.

Nevertheless, the Court addresses that element briefly.

Plaintiff argues that he is highly likely to succeed on the merits of his trademark infringement claims because he owns valid, protectable common-law rights in the CS ATHLETIC mark arising from continuous use in connection with cheerleading apparel since March 2010. Mot. at 4-8. Plaintiff contends that defendants' earlier use of CSTOWN concerned rhinestones and heat-transfer products rather than cheerleading uniforms and apparel, and that defendants have failed to establish sufficiently substantial pre-2010 commercial use to support priority or a natural-zone-of-expansion defense. Id.

Defendants counter that plaintiff cannot establish a likelihood of success because defendants began using CSTOWN in commerce in 2006, approximately four years before plaintiff's asserted first use, and subsequently obtained federal registration of the mark in 2012. Defendants argue that their historical rhinestone and heat-transfer products were marketed to the cheerleading and dance industries and that their later expansion into finished apparel fell within the natural zone of expansion of their established business.

[2] At the hearing, plaintiff emphasized that defendants have opposed his registration of the CS ATHLETIC mark and that they have admitted likelihood of confusion in the Trademark Trial and Appeal Board proceeding. Notwithstanding defendants' position before the Board, a simple review of the respective marks indicates that there is no basis for a finding of likelihood of confusion.

As such, each side disputes the other's ownership of the mark. While their evidence is less than clear, it does not appear that, on this record, either party has established that the other does not own the mark. Accordingly, the Court concludes that, on the present record, plaintiff has failed to carry his burden to show that he is likely to prove ownership. See A & L Lab'ys, Inc. v. Bou-Matic, LLC, No. CIV. 02-4862 PAMRLE, 2003 WL 21729977, at *3 (D. Minn. July 21, 2003) ("Because the evidence on the issue of ownership, including the language of the parties' two agreements, is ambiguous at best, each party argues that it is the owner of the trademarks as a matter of law. . . . However, the issue of ownership is nearly impossible to resolve on the thin record before the Court on a motion for preliminary injunction.").

### C. Alternative "Serious-Questions" Standard

Plaintiff alternatively may obtain preliminary relief by demonstrating "serious questions going to the merits" where "the balance of hardships tips sharply in the [plaintiff's] favor," provided that the remaining requirements for preliminary injunctive relief are satisfied. All. For The Wild Rockies v. Cottrell, 632 F.3d 1127, 1131-32 (9th Cir. 2011).

Here, however, even assuming that plaintiff has established serious questions going to the merits, the balance of hardships do not sharply tip in plaintiff's favor, particularly given that both parties have colorable claims to the use of the contested mark. See Pollution Denim & Co. v. Pollution Clothing Co., 547 F. Supp. 2d 1132, 1138 (C.D. Cal. 2007) ("In a trademark infringement action, however, where both parties have colorable claims to the use of a contested mark, the balance of hardships will rarely if ever 'tip sharply' in one side's favor, requiring the moving party to demonstrate a 'strong showing of likelihood of success' on the merits."); MicroStrategy Inc. v. Motorola, Inc., 245 F.3d 335, 339-40 (4th Cir. 2001) ("In this case, the grant of an injunction would cause at least as much harm to the defendant, Motorola, as its denial would to the plaintiff, MicroStrategy. Indeed, to some extent, the parties' arguments on irreparable harm present two sides of the same coin. Each maintains that it has superior rights to the use of 'Intelligence Everywhere' as a trademark and that the grant, or denial, of injunctive relief will cause irreparable harm to its use of the mark").

Plaintiff identifies as hardship that CS Athletic is "highly likely to continue to lose business" to CSTown in the absence of an injunction. Mot. at 19. By contrast,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL ‘O’**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-00874-CAS-AJRx | Date | November 2, 2026 |
| Title | James H. Lundberg v. CStown Cultural and Creative Dalian Co., Ltd. et al | | |

defendants maintain that the requested injunction would require defendants to "undertake a wholesale rebrand, to use a different website than it has used as the predominate means of selling its goods and services for 20 years, to change its social media accounts, notify all [] of its hundreds of customers, select and invest in a new trademark, replace packaging, waste inventory, revise ads and marketplace listings, among numerous other disruptions." Opp. at 24-25. Defendants further argue that if required to undertake that "expense, disruption, and investment in an entirely new brand," this case would be practically over and plaintiff would have won based on an "interim showing and incomplete record" because, even if defendants ultimately prevail at trial, they are unlikely to at that point undertake and finance the reversal of the re-brand process. Id.

The Court concludes that the concrete and immediate disruption to defendants far outweighs plaintiff's speculative claim that its loss in sales would continue as a result of defendants' operation using its mark. See Kiva Health Brands LLC v. Kiva Brands Inc., 402 F. Supp. 3d 877, 899 (N.D. Cal. 2019) ("The hardship to KBI in granting an injunction and forcing it to undergo a massive rebranding of a name it has built up for about nine years would therefore be much greater than the hardship to KHB in denying an injunction and thereby maintaining the status quo."); Vital Pharms. v. PHD Mktg., 2021 U.S. Dist. LEXIS 254038, *22-23 (2021) (finding a preliminary injunction unwarranted "[g]iven the minimal instances of Plaintiffs' loss of goodwill," and the "potentially devastating impact to Defendant's business of an injunction," plus the "absence of evidence that Defendant's alleged infringement was undertaken in bad faith").

### D. Irreparable Harm

As an independent basis for denying the Motion, the Court concludes that plaintiff has not established a likelihood of imminent, irreparable harm in the absence of a preliminary injunction. Indeed, plaintiff's delay in seeking a preliminary injunction undermines his claim of urgency. See Lydo Enterprises, Inc. v. City of Las Vegas, 745 F.2d 1211, 1213 (9th Cir. 1984) ("A preliminary injunction is sought upon the theory that there is an urgent need for speedy action to protect the plaintiff's rights. By sleeping on its rights a plaintiff demonstrates the lack of need for speedy action.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL ‘O’**

| | | | |
|---|---|---|---|
| Case No. | 2:26-cv-00874-CAS-AJRx | Date | November 2, 2026 |
| Title | James H. Lundberg v. CStown Cultural and Creative Dalian Co., Ltd. et al | | |

Here, defendants have sold Athletic Goods under the CSTOWN mark since 2019, reflecting at least seven years of the parties' coexistence in the same market.[3] Plaintiff was also on notice of the parties' commercial coexistence at least by 2023, when the first instance of consumer confusion identified in his Motion occurred. Mot. at 13. Yet plaintiff did not send defendants a cease-and-desist letter until October 2025 and did not commence this action until January 2026. Mot. at 4. And even after filing suit, plaintiff waited more than eight months, until October 2026, to move for a preliminary injunction, by which time the parties were already engaged in discovery. Opp. at 12. Thus, despite his asserted awareness of consumer confusion dating back several years, plaintiff delayed both in asserting his rights and in seeking preliminary relief. This prolonged delay weighs against the finding that defendants' continued use of the CSTOWN mark presents an imminent threat of irreparable harm warranting immediate intervention. See iFreedom Direct Corp. v. McCormick, No. SACV 16-470-JLS (KESx), 2016 U.S. Dist. LEXIS 192173, at *10 (C.D. Cal. June 15, 2016) (finding that "ten months delay" in seeking preliminary injunction from when plaintiff "first sent the cease and desist letter" undermines "its claim of irreparable harm"); Valeo Intellectual Prop., Inc. v. Data Depth Corp., 368 F. Supp. 2d 1121, 1128 (W.D. Wash. 2005) ("A three-month delay in seeking injunctive relief is inconsistent with [the plaintiff's] insistence that it faces irreparable harm."); Montana Pub. Int. Rsch. Grp. v. Jacobsen, 731 F. Supp. 3d 1175, 1192 (D. Mont. 2024), aff'd, No. 24-2811, 2024 WL 4023781 (9th Cir. Sept. 3, 2024) ("A delay in seeking injunctive relief cuts against a party's claim that it will suffer irreparable harm absent injunctive relief.").

[3] At the hearing, plaintiff argued that defendants offer scant evidence as to their operations in the same market as plaintiff since 2019. Plaintiff further argued that 2022 is the earliest date defendants could claim for their entry into the cheerleading Athletic Goods market and that, even then, the evidence defendants offer is scant as to the extent of their market entry. Plaintiff, on those bases, contested the notion that he slept on his rights for a long time. The Court is unpersuaded by plaintiff's argument. As the Court explains *infra*, plaintiff was on notice of the parties' mutual existence in the same market at least by 2023. Accordingly, even considering 2023 as the operative date, plaintiff still waited years to seek preliminary relief. Accordingly, the Court's conclusion is unaltered by this argument.

To the extent that plaintiff contends that the timing of his Motion is justified by the approximately 35% decline in CSA's peak-season sales in 2026, which he attributes to defendants' increased advertising expenditures in 2025, Reply at 16-17[4], the Court is unpersuaded. Although plaintiff asserts that the impact of defendants' advertising did not become apparent until 2026, he has not sufficiently established that the decline in sales was attributable to consumer confusion rather than other competitive factors. See generally Mot.; Reply.

Moreover, plaintiff's assertion that defendants' continued use of the CSTOWN mark will lead to further losses in sales and ultimately force CS Athletic to cease operations is speculative, particularly given the absence of sufficient evidence linking plaintiff's declining revenue to consumer confusion. Such "[s]peculative injury" cannot constitute irreparable harm warranting preliminary relief. Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668, 674 (9th Cir. 1988).

Finally, to the extent that plaintiff contends "consumers viewing others wearing or using [d]efendants' defective and/or lower quality" Athletic Goods will "attribute the defects and lesser quality" to plaintiff, thereby damaging CS Athletic's reputation and goodwill, the Court is unpersuaded, again given that plaintiff has not sufficiently set forth evidence of consumer confusion. Mot. at 18. And as defendants point out, if plaintiff

[4] Defendants object to the supplemental declaration that plaintiff filed with his Reply on the ground that plaintiff "adds various new factual assert[ions]," including regarding his "decision to delay in bringing the instant preliminary injunction." Dkt. 51. Generally, a party cannot raise new evidence or arguments in a reply brief. See Zamani v. Carnes, 491 F.3d 990, 997 (9th Cir. 2007). If new evidence is presented, a court typically can strike the evidence or give the opposing party a chance to respond. See Atl.-Pac. Processing Sys. NV Corp. v. Plaut, No. 221CV2060JCMNJK, 2023 WL 2744660, at *5 (D. Nev. Mar. 31, 2023). However, if the new evidence responds to an argument raised in the response brief, then a surreply is not always warranted. Atl.-Pac. Processing Sys. NV Corp. v. Plaut, No. 221CV2060JCMNJK, 2023 WL 2744660, at *5 (D. Nev. Mar. 31, 2023). Here, plaintiff's new evidence regarding his delay is responsive to an argument raised by defendants' response. In any event, even considering plaintiff's "new" factual assertions, the Court finds that plaintiff has failed to carry his burden to show that preliminary relief is warranted.

had been concerned about the damaging association of defendants' goods to his mark, he would not have waited this long to seek preliminary relief. Opp. at 15. As for plaintiff's declining sales allegedly due to defendants' use of their mark, this injury, if it exists, is compensable with monetary damages should plaintiff prevail on the merits. See Walters v. Reno, 145 F.3d 1032, 1048 (9th Cir. 1998) ("Injunctive relief is proper only if monetary damages or other legal remedies will not compensate the plaintiffs for their injuries.").

Accordingly, the Court finds that plaintiff fails to establish a likelihood of imminent irreparable harm to warrant preliminary relief.[5]

## V. CONCLUSION

In accordance with the foregoing, the Court **DENIES** plaintiff's motion for entry of a preliminary injunction.

IT IS SO ORDERED.

| | | |
|---|---|---|
| | 00 | : 35 |
| Initials of Preparer | CMJ | |

[5] The Court also notes that although the Lanham Act provides a rebuttable presumption of irreparable harm upon finding a likelihood of success on the merits, that presumption does not arise here, given the Court's prior determination that plaintiff has failed to carry his burden in showing his likelihood of success on the merits for his claims. See InSinKerator, Ltd. Liab. Co. v. Joneca Co., Ltd. Liab. Co., 163 F.4th 608, 622 (9th Cir. 2025) ("After eBay was decided, Congress amended 15 U.S.C. § 1116(a) to provide 'a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits.'"). However, even assuming that the presumption applies here, the Court finds that the presumption has been rebutted.